[No. B153449. Second Dist., Div. Two. Oct. 10, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
RHODY MITCHELL FEASTER, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II. of the Discussion.

## COUNSEL

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc E. Turchin and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ASHMANN-GERST, J.—A jury convicted appellant Rhody Mitchell Feaster of assault with a firearm in violation of Penal Code section 245, subdivision (a)(2)[1] (count 1); discharge of a firearm with gross negligence in violation of section 246.3 (count 2); and misdemeanor battery in violation of section 242 (count 3). The jury found true the allegations in counts 1 and 2 that appellant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a firearm (§ 12022.5, subds. (a)(1) & (d)). Appellant admitted a prior strike allegation. The trial court sentenced appellant to a total of 20 years in state prison.

On appeal, appellant contends that: (1) the trial court committed reversible error when it did not allow appellant to impeach a prosecution witness with a prior conviction of a crime of moral turpitude, and (2) the trial court erred in reading CALJIC No. 17.41.1 to the jury. We find no merit in appellant's contentions and affirm.

### FACTS

#### I. *Prosecution Evidence*

On October 1, 2000, between 8:00 p.m. and 9:00 p.m., Otis Taylor (Taylor), also known as "Luncheon," was walking down West 84th Street in Los Angeles, between Broadway and Main Street. He was walking with Lawrence Lee (Lee), who is also known as Lorenzo White. They heard gunshots and saw people running, saying that "somebody is shooting." Lee jumped a fence, and Taylor was hit in the leg with a bullet. Taylor believed it was appellant who shot him because Taylor saw fire or a flash coming from the spot where appellant was standing, and Taylor saw no one else standing near appellant. Taylor did not see a weapon. Taylor saw four or five

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

people running and saying "Rhody's shooting. Rhody's shooting." Appellant was approximately 32 feet from Taylor.

Taylor was rushed to the hospital. He spent approximately five days in the hospital and underwent surgery twice.

Officer Adam Futami, the investigating officer, showed Taylor a group of six photographs, and Taylor identified appellant as the shooter. While Taylor was in the hospital, a friend named Leon telephoned him. After Leon spoke with Taylor, Leon put appellant on the line. Appellant told Taylor that he would not do anything to hurt Taylor and "he did not mean to do it."

Veronica Curtis (Curtis) is Lee's lady friend. Curtis lived on West 84th Street. At appellant's trial she stated she did not recall anything about her interaction with appellant on the night of the shooting. She heard shots and she admitted having a conversation with appellant. The prosecutor impeached Curtis with her statements to a police officer on the night of the shooting—statements that implicated appellant as the shooter and contradicted Curtis's trial testimony.

The prosecutor also produced a six-pack of photographs that Officer Futami had shown Curtis. Curtis acknowledged circling the photograph of appellant and initialing the photo sheet. She had written a statement saying that "[t]he person in picture number 6 slapped me down to the ground and then went to his house and came back with a gun and started shooting at me." The prosecutor impeached Curtis with statements she made to Officer Futami after the incident, in which she had accused appellant of slapping her down and shooting at her with a rifle.

Roy Russell (Russell) testified that he lived across the street from appellant's residence. He grew up with appellant. Russell testified that he did not recall the shooting of Taylor, although he knows Taylor, whom he also called "Lunch Meat" or "Luncheon." Russell said he did not recall telling Officer David Tello that he saw appellant point a rifle toward Curtis and fire one time. He did not recall telling Officer Tello that Lee approached appellant, that appellant ran inside and returned with a blue steel semiautomatic handgun, and that appellant fired approximately two to three times at Lee's feet. He did not recall Officer Futami showing him a set of photographs, and he did not recall circling appellant's photo, although he acknowledged that the initials and date appeared to be in his writing. Russell also acknowledged that the statement he read appeared to be in his writing. The statement said: "I witnessed number 6 hit a woman on 84th Street, then fire a rifle into a crowd at the corner, then put a pistol into Lawrence Lee's

head and tell [*sic*] him he would kill him. The shot into the crowd hit Luncheon, who ambulated home and called E.M.S."

After reading his prior statement, Russell testified that the statement did not refresh his memory. He did not recall telling Officer Futami about the argument and slapping incident between Curtis and appellant, or that appellant shot at Lee's feet. He denied being in fear for his safety. On cross-examination, he admitted he would not have written the statement if it had not been true. He admitted he "can't stand" appellant because appellant once tried to hit him with a rock, but asserted that nothing would have made him lie on the statement he wrote for the police.

Randal McNary, an investigator for the district attorney, testified that he spoke by telephone with a man whom he identified as Russell in April 2001. Russell told him he saw appellant shooting at the victim. Russell also said he might get amnesia if he had to go to court.

Officer Tello interviewed Russell on the night of the shooting. Russell told him that he saw appellant fire a rifle toward Curtis. He saw appellant fire two or three rounds at Lee's feet with a semiautomatic. When Officer Tello interviewed Curtis, she told Officer Tello about the slapping incident and that appellant fired a rifle at her. Officer Tello was unable to find appellant that night. He was last seen running away. Police found no shell casings or bullets at the scene.

II. *Defense Evidence*

Marianna Lewis is Russell's cousin. Lewis testified that Russell said several times he was going to say appellant did the shooting because Russell did not like appellant.

Appellant's mother, Queen Feaster, lives on West 84th Street. On the night of the shooting, she heard the shots. She did not see her son enter or exit the house either before hearing the shots or after hearing them.

DISCUSSION

I. *Refusal to Allow Impeachment of Prosecution Witness*

A. *Proceedings Below*

Prior to calling Russell to the stand, the prosecutor moved to exclude "anything" from Russell's record. She stated Russell had denied any felony

convictions, but he had a misdemeanor conviction for negligent discharge of a firearm. (§ 246.3.) The trial court said the offense was not a crime of moral turpitude. Defense counsel stated that he believed Russell had a felony conviction of section 246.3. The trial court told defense counsel that he must produce documentary proof of a felony conviction if he intended to impeach Russell with the section 246.3 offense.

After Russell had testified and been dismissed subject to recall, defense counsel showed the trial court a certified copy of the minute order of Russell's conviction for negligent discharge of a firearm. Defense counsel acknowledged he was still not sure if the conviction was for a felony or misdemeanor. The trial court conducted its own research and concluded that the crime did not involve moral turpitude, stating, "it involves negligence, from what I see. The purpose of the statute is to prohibit willful and unlawful discharge of a firearm in a grossly negligent manner which could result in injury or death to persons, was clearly intended to deter discharge of firearms on holidays, such as New Year's and Independence Day, that sort of thing. [¶] Now I would be hard-pressed to find that a person—it's much like a person being under the influence of cocaine, a small amount of cocaine under [Health and Safety Code section] 11350. That's not a crime of moral turpitude, as opposed to somebody charged with grand theft. . . ." The trial court ruled it would not allow the impeachment.

Defense counsel objected under Evidence Code section 788,[2] asserting that any felony conviction may be used for impeachment unless it meets an exception or is deemed legally irrelevant under Evidence Code section 352. The prosecutor maintained the offense was not one of moral turpitude, and, even if it were, she would move to exclude the conviction under Evidence Code section 352, pointing out that the conviction was 12 years old.

The trial court commented: "I'll make a finding that it's not a crime of moral turpitude. In any case, it would be excluded under [Evidence Code section] 352 based on the age of the conviction, the nature of the underlying charge, which is a questionable crime of moral turpitude, and the fact that you're showing me nothing that shows any interim conduct of any sort."

B. *Appellant's Argument*

 Appellant argues that Russell's prior offense was a crime of moral turpitude. Thus, he contends the trial court's error in refusing to allow

---

[2]Evidence Code section 788 provides, in pertinent part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ."

impeachment with that offense was an error of constitutional magnitude because it violated appellant's right to present a defense under the due process clause of the Fifth and Fourteenth Amendments. According to appellant, Russell was a key prosecution witness, and his impeachment could have been highly influential to the jury.

## C. *Relevant Authority*

■ Any prior felony conviction that "necessarily involve[s] moral turpitude" is admissible to impeach a witness's testimony. (*People v. Castro* (1985) 38 Cal.3d 301, 306 [211 Cal.Rptr. 719, 696 P.2d 111] (*Castro*).) Moral turpitude is defined as the "*general readiness to do evil.*" (*Id.* at p. 314; accord, *People v. Barnett* (1998) 17 Cal.4th 1044, 1126-1127 [74 Cal.Rptr.2d 121, 954 P.2d 384].) *Castro* made no attempt to list those felonies that do not involve moral turpitude. (*Castro, supra,* at p. 314.) *Castro* does make clear, however, that moral turpitude does not depend on dishonesty being an element of the crime. (*Id.* at p. 315.) "[I]t is undeniable that a witness' [*sic*] moral depravity of any kind has some 'tendency in reason' [citation] to shake one's confidence in his honesty." (*Ibid.*)

As stated in *People v. Wheeler* (1992) 4 Cal.4th 284, 295 [14 Cal.Rptr.2d 418, 841 P.2d 938] (*Wheeler*), " 'There is . . . some basis . . . for inferring that a person who has committed a crime which involves moral turpitude [even if dishonesty is not a necessary element] . . . is more likely to be dishonest than a witness about whom no such thing is known. Certainly the inference is not so irrational that it is beyond the power of the people to decree that in a proper case the jury must be permitted to draw it . . . .' " (Quoting *Castro, supra,* 38 Cal.3d at p. 315, fn. omitted.)

Nevertheless, only if "the least adjudicated elements of the conviction necessarily involve moral turpitude" is the conviction admissible for impeachment. (*Castro, supra,* 38 Cal.3d at p. 317.) The "least adjudicated elements" test means that "from the elements of the offense alone—without regard to the facts of the particular violation—one can reasonably infer the presence of moral turpitude." (*People v. Thomas* (1988) 206 Cal.App.3d 689, 698 [254 Cal.Rptr. 15] (*Thomas*); accord, *People v. White* (1992) 4 Cal.App.4th 1299, 1303 [6 Cal.Rptr.2d .259] (*White*); *People v. Bautista* (1990) 217 Cal.App.3d 1, 6 [265 Cal.Rptr. 661].) *Castro* did not intend to preclude use of a prior conviction for impeachment purposes merely because there exists a reasonable set of circumstances under which the crime could have been committed without moral blame. Otherwise, no prior conviction could be used for impeachment. (*Thomas, supra,* at p. 698.)

■ The admission of past misconduct involving moral turpitude to impeach a witness in a criminal trial is subject to the trial court's discretion

under Evidence Code section 352. (*Wheeler, supra,* 4 Cal.4th at p. 296.) On appeal, the trial court's decision is reviewed for abuse of discretion. (*People v. Clair* (1992) 2 Cal.4th 629, 655 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*); accord, *Wheeler, supra,* at p. 296.) To constitute an abuse of discretion, "the resulting injury [must be] sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, . . . the court [must] exceed[] the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].) In most instances the appellate courts will uphold the exercise of discretion even if another court might have ruled otherwise. (*Clair, supra,* at p. 655.)

### D. *Negligent Discharge of a Firearm a Crime of Moral Turpitude; No Abuse of Discretion Under Evidence Code Section 352*

██ We conclude that a violation of section 246.3 constitutes a crime of moral turpitude. However, we also conclude that the trial court did not abuse its discretion in excluding Russell's prior conviction for this offense as a form of impeachment under Evidence Code section 352. Regardless, any error in excluding evidence of Russell's conviction was harmless.

Courts have found a readiness to do evil in crimes such as felony vandalism (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1493 [28 Cal.Rptr.2d 716]), attempting to flee from a peace officer by driving in willful or wanton disregard for the safety of others (*People v. Dewey* (1996) 42 Cal.App.4th 216, 221-222 [49 Cal.Rptr.2d 537]), possession of a firearm by a felon (*People v. Littrel* (1986) 185 Cal.App.3d 699, 703 [230 Cal.Rptr. 83]), and shooting at an inhabited dwelling (*White, supra,* 4 Cal.App.4th at p. 1304).

In contrast, courts have held that passive crimes do not involve moral turpitude. For example, in *People v. Sanders* (1992) 10 Cal.App.4th 1268, 1274 [13 Cal.Rptr.2d 205], the court held that child endangerment in violation of section 273a, subdivision (1) was not a crime of moral turpitude because it required wholly passive conduct. In *Castro* as well, the court determined that simple possession of heroin involved passive conduct and was not a crime of moral turpitude, whereas sale of narcotics involved corruption of others and hence moral turpitude. (*Castro, supra,* 38 Cal.3d at p. 317.)

With respect to the instant offense, *People v. Clem* (2000) 78 Cal.App.4th 346, 351 [92 Cal.Rptr.2d 727] (*Clem*), held that grossly negligent discharge of a firearm in violation of section 246.3 was an inherently dangerous felony and posed "a sufficient danger to human life to support a conviction for

second degree felony murder." *Clem* determined that a violation of this statute presupposes that there are reasonable grounds to believe people will be endangered, and that it is logical to impute malice to those who commit this offense. (*Clem,* at pp. 352-353.)

Mindful of these cases, we turn to section 246.3, which provides: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in the county jail not exceeding one year, or by imprisonment in the state prison." ██ Accordingly, the least adjudicated elements of section 246.3 are that: (1) a person willfully and unlawfully discharged a firearm, (2) the person discharged the firearm in a grossly negligent manner, and (3) the person discharged the firearm in a manner that could result in injury or death to a person. (See *Clem, supra,* 78 Cal.App.4th at pp. 350-351; CALJIC No. 9.03.3.)

After careful consideration of past precedent and the least adjudicated elements of section 246.3, we hold that an individual who discharges a firearm under circumstances that show an indifference to the consequences of his actions can be said to demonstrate moral turpitude. In contrast to passive crimes, the crime described by section 246.3 is comprised of an affirmative act committed with gross negligence to the degree that it could result in injury or death. ██ "Gross negligence" means conduct that is " ' "such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." ' " (*People v. Alonzo* (1993) 13 Cal.App.4th 535, 539-540 [16 Cal.Rptr.2d 656] (*Alonzo*); see CALJIC No. 3.36.) Such conduct clearly involves moral deficiency.

██ The fact that the purpose behind the enactment of section 246.3 was to deter the discharge of firearms during holiday celebrations does not diminish the perpetrator's moral turpitude. (*Alonzo, supra,* 13 Cal.App.4th at p. 539.) The author of the legislation enacting section 246.3 referred to two deaths attributed to such celebrations in Los Angeles alone. (*Alonzo, supra,* at p. 540.) An examination of the minimum conduct that constitutes the offense of grossly negligent discharge of a firearm leads to the conclusion that it is a crime of moral turpitude. (*Castro, supra,* 38 Cal.3d at p. 317; *Thomas, supra,* 206 Cal.App.3d at pp. 694, 698.)

██ In the instant case, however, the trial court properly exercised its discretion to exclude evidence of Russell's conviction under Evidence Code

section 352, which allows a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court named appropriate factors for its decision, stating that the offense was committed 12 years before appellant's trial and there was no evidence that Russell had committed any offenses since that time. (See *People v. Beagle* (1972) 6 Cal.3d 441, 453-454 [99 Cal.Rptr. 313, 492 P.2d 1].) Also, defense counsel was unable to prove whether Russell was convicted of a misdemeanor or a felony pursuant to section 246.3, which is a "wobbler" offense,[3] and Russell had already finished his testimony and been dismissed (although subject to recall). Therefore, there was a significant danger of undue consumption of time and undue prejudice. These factors substantially outweighed the marginal probative value of impeaching Russell's honesty with an old conviction that was not shown with certainty to be a felony and which did not strongly reflect on Russell's honesty in any event. (See *Wheeler*, *supra*, 4 Cal.4th at pp. 296-297; *Castro*, *supra*, 38 Cal.3d at p. 315 [stating that convictions not based on dishonesty weigh less heavily in the balance, favoring admissibility].)

Moreover, any error in excluding the evidence was harmless under any standard. Russell impeached himself very effectively with his supposed inability to recall anything about the shooting or his prior statements to law enforcement. In addition, Russell was not the only witness whose former statements and trial testimony implicated appellant. Taylor, the shooting victim, saw a flash of fire coming from the place where appellant alone was standing. Also, appellant apologized to Taylor by telephone. Curtis, who also suffered memory loss at trial, was impeached with her statements to police in which she named appellant as the shooter. There were also two police witnesses who testified to the statements they received from Russell and Curtis. Appellant's disappearance after the shooting and the fact that several people said "Rhody's shooting" while running for cover on the night of the incident, constituted additional damaging evidence against appellant.

Therefore, appellant's argument that the exclusion of impeachment evidence against Russell resulted in a miscarriage of justice is to no avail.

II. *CALJIC No. 17.41.1**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3]Section 246.3 allows the trial court to exercise its discretion and impose sentence as either a felony or misdemeanor offense. (§ 17, subd. (b).)

*See footnote, *ante*, page 1084.

## DISPOSITION

The judgment is affirmed.

Boren, P. J., and Doi Todd, J., concurred.

On October 17, 2002, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 15, 2003.